Ryan Anthony BLACKBURN,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 95–55859.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 1996.

Decided Nov. 19, 1996.

Kurt P. Autor, Falkowski & Autor, Los Angeles, CA, for plaintiff-appellant.

Roger E. West and Julie Zatz, Assistant United States Attorneys, Los Angeles, CA, and Barbara Goodyear, (of counsel), United States Department of the Interior, San Francisco, CA, for defendant-appellee.

Before: D.W. NELSON, T.G. NELSON and THOMAS, Circuit Judges.

T.G. NELSON, Circuit Judge:

## I

Ryan Anthony Blackburn filed an action for damages against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* ("FTCA"). Blackburn claimed that the Government was negligent in failing to warn of the danger of diving off the Stoneman Bridge in Yosemite National Park. The Government moved for summary judgment, claiming that the district court lacked subject matter jurisdiction over the action under the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). The district court granted summary judgment in favor of the Government and dismissed the action. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## II

On July 21, 1991, Blackburn dove off the Stoneman Bridge in Yosemite National Park. As a result of the dive, Blackburn suffered severe injuries which rendered him a permanent quadriplegic.

The Stoneman Bridge is located in the Yosemite Valley in Yosemite Park. Yosemite Park is owned by the United States and operated by the National Park Service ("NPS"). During weekends in the summer months, visitation to Yosemite routinely exceeds approximately 40,000 persons. During the course of the day, the vast majority of these visitors travel through the Yosemite Valley floor.

The Stoneman Bridge spans the Merced River. At the time of the accident, the bridge had two lanes of traffic and pedestrian walkways on both sides. A granite block wall ran along both sides of the bridge. The distance from the top of the block wall to the water surface was approximately twenty feet.

In July 1981, ten years prior to Blackburn's accident, six signs stating "DANGEROUS TO DIVE FROM BRIDGE" were installed at the bridge. At the time of the accident, these six signs were in place on and around the bridge. Blackburn admits that he saw these signs prior to diving from the bridge.

Blackburn filed an action for damages in federal district court, claiming that the Government was negligent in failing to (1) warn of the dangerous condition of the Stoneman Bridge and the watercourse under it; (2) properly design and maintain Stoneman

Bridge and the watercourse under it; (3) sound the Merced River beneath Stoneman Bridge to determine water depth, locate eddies and pools, dangerous currents, sunken logs and rocks and other hazardous conditions; and (4) post signs indicating water depth, location of eddies and pools, dangerous currents, sunken logs and rocks and other hazardous conditions.

The Government moved for summary judgment, claiming that the district court lacked subject matter jurisdiction pursuant to the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). The district court granted the Government's summary judgment motion and dismissed the action. Blackburn timely appeals.

### III

"We review *de novo* both the district court's grant of summary judgment as well as its determination of subject matter jurisdiction." *Faber v. United States,* 56 F.3d 1122, 1124 (9th Cir.1995). "Although the plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, the United States bears the ultimate burden of proving the applicability of the discretionary function exception." *Id.* (quotations omitted).

### IV

#### A. *Discretionary Function Exception*

■ An action can be brought by a party against the United States only to the extent that the Federal Government waives its sovereign immunity. *Valdez v. United States,* 56 F.3d 1177, 1179 (9th Cir.1995). The FTCA waives the Government's sovereign immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment. *Id.* Thus, the Government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

■ The FTCA's waiver of immunity is limited, however, by the discretionary func-

tion exception, which bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "restores the government's immunity in situations where its employees are carrying out governmental or 'regulatory' duties." *Faber,* 56 F.3d at 1124 (citing 138 Cong. Rec. S13982–01, *S14010 (daily ed. Sept. 18, 1992)).

■ To determine whether the challenged conduct falls within the discretionary function exception, we employ a two-step analysis. First, we must determine "whether the challenged actions involve 'an element of judgment or choice.'" *Valdez,* 56 F.3d at 1179 (quoting *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991)). This requirement is not met where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). In this event, the inquiry is at an end and the discretionary function exception does not apply because "the employee has no rightful option but to adhere to the directive." *Id.*

■ However, if an element of choice or judgment is involved, we must move on to the second step of the analysis and determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert,* 499 U.S. at 322–23, 111 S.Ct. at 1273–74. The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323, 111 S.Ct. at 1273–74. In other words, only those decisions "grounded in social, economic, and political policy" will be protected by the discretionary function exception. *Childers v. United States,* 40 F.3d 973, 974 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1821, 131 L.Ed.2d 744 (1995).

#### 1. *Discretion*

■ This court must first determine whether the challenged conduct is a matter

of choice or judgment for NPS employees. Blackburn contends that NPS failed to comply with mandatory duties of care under a previously adopted safety plan contained in NPS regulations and guidelines and that therefore the discretionary function exception does not apply. Our analysis of this issue is guided by earlier cases involving NPS regulations and the discretionary function exception.

In *Valdez v. United States*, 56 F.3d 1177, Valdez was rendered a quadriplegic when he fell down a waterfall in Kings Canyon National Park. The park was owned by the United States and operated by the NPS. Valdez had been out hiking with friends when the accident occurred. He was attempting to descend down the side of the falls when he lost his footing and fell to the base of the falls. *Id.* at 1178. Valdez brought suit against the United States under the FTCA to recover for his injuries, claiming that the NPS failed to adequately warn the public of potential hazards.

Valdez relied on various NPS policy manuals and testimony by NPS employees that the regulations in the manuals were mandatory to support his argument that the NPS lacked any choice or judgment over the challenged conduct. *Id.* at 1179–80. We rejected this argument:

> While the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which NPS employees meet these goals necessarily involves an exercise of discretion. These guidelines can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions....

> We similarly believe that the Management Guidelines' broad mandate to warn the public of "special hazards" through educational materials, brochures, pamphlets, and the like necessarily encompasses an element of discretion in identifying such hazards. Because the NPS cannot apprise the public of every potential danger posed by every feature of the Park, a degree of judgment is required in order to determine which hazards require an explic-

it warning and which hazards speak for themselves.

*Id.* at 1180. Thus, we held that the challenged conduct involved discretionary choice or judgment and therefore fell within the discretionary function exception.

In *Childers v. United States*, 40 F.3d 973, David Childers died in a winter hiking accident in Yellowstone National Park. The trail on which he was hiking was unmaintained in the winter, and no signs were posted on the trail warning of any danger. David's parents brought an action against the United States under the FTCA, claiming the NPS failed to warn of known dangers.

To determine whether the NPS's failure to post warning signs on the trail fell within the discretionary function exception, we reviewed the various statutes under which the NPS employees operated. *Id.* at 974. We noted that 16 U.S.C. § 1 requires the NPS to balance preservation with public access. This requires the NPS to exercise judgment and choice in determining what facilities and safety features, if any, to provide. *Id.* The Yellowstone Ranger Operating Manual required NPS personnel to balance visitor safety against public access; and the Loss Control Management Program required the NPS to provide a reasonably safe environment while protecting resources and processes which may be dangerous. *Id.* We held that these regulations and guidelines leave the decision as to the posting of warning signs in the hands of NPS rangers. *Id.* at 975–76. "Their decisions are policy-based, requiring them to balance access with safety, and take into account conservation and resources in designing area plans and making individual trail determinations." *Id.* at 976.

In arguing that the NPS did not have discretion, David's parents relied on an NPS safety manual which provided: "If roads and trails cannot be maintained as designed and built, they should either be closed or the public adequately warned." *Id.* Because the trail in question had not been closed, the NPS was required to adequately warn the public. "However, decisions as *to the precise manner* in which NPS would warn the public as to trails which are left open, but unmaintained in the winter, clearly fall within the

discretionary function exception." *Id.* There was no regulation or guideline requiring the NPS to place warnings along the trail. The NPS had provided warnings through park brochures, visitor center displays, bulletin board information and personal contacts.

Park rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety. This decision was precisely the kind the discretionary function exception was intended to immunize from suit. *Id.* We therefore held that the NPS was immune from liability under the discretionary function exception.

The statutes and regulations under which the NPS operated in the present case are similar to those in *Valdez* and *Childers.* The NPS Loss Control Management System for Yosemite National Park states that it is park policy to identify hazards in the park environment to protect park visitors from accident or illness. NPS Loss Control Management System–Yosemite National Park at vi. "Where it is not possible or feasible to physically control the hazards, adequate warning information and alternative action shall be provided." *Id.* NPS's Loss Control Management Program Guideline ("NPS–50") specifies that the objectives of the NPS Safety and Occupational Health Program include providing for the health and safety of the public (visitors) from recognized hazards of NPS operations, lands, and facilities.

Chapter five of the NPS–50 provides the inspection and hazard abatement process that is to be used in the public safety and health context. It provides that formal inspections shall be conducted at least annually. Where there is an increased risk of accidents, more frequent inspections are to be conducted. An "inspection" is a comprehensive survey of all or part of the area in order to detect safety and health hazards. If a formal inspection identifies a hazard as being an imminent danger—a condition or practice which is such that a danger exists that could reasonably be expected to cause death or serious physical harm—corrective/protective action is to be taken immediately.

Chapter twenty-two provides that all areas are to provide special materials, signs, and programs to alert the public to potential dangers. Brochures specific to the area are to direct attention to special hazards or attractions that could be potentially hazardous to the visitor. The park safety officer is to review signage in the park to determine whether it is appropriate for the area signed. Park employees are responsible for identifying hazards within NPS areas that may cause injury, illness, death, or property damage to park visitors.

The NPS Management Policies Manual provides that adherence to NPS policy will be mandatory unless waived or modified by the appropriate authority.

As in *Valdez* and *Childers*, the statutes and regulations under which the NPS operated in the present case necessarily encompass an element of discretion in deciding how and when to warn the public of known dangers. Although the policy manuals outline general policy goals regarding visitor safety, they do not set out the specific means by which the NPS employees are to meet these general goals. Furthermore, the policy manuals' broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards. *See Valdez,* 56 F.3d at 1180; *Childers,* 40 F.3d at 976.

Blackburn relies on *Summers v. United States,* 905 F.2d 1212 (9th Cir.1990), in support of his contention that the NPS did not have any discretion. In that case, Summers was injured during a visit to Rodeo Beach, which is part of a park operated by the NPS. *Id.* at 1213. While walking with her family in the park, Summers attempted to balance herself upon a rock which was part of a fire ring. She lost her balance and burned her foot on hot embers within the fire ring. *Id.* Summers filed an action against the United States under the FTCA to recover for the resulting injury to her foot.

At the time of Summers' injury, the park was subject to NPS and Department of Inte-

rior regulations concerning visitor safety. We stated:

> Under the [park's] safety program as well as the Interior Department guidelines, corrective action by park officials is mandated as soon as a hazard is identified as posing a risk of serious injury to the public. A failure to address an identified danger is inconsistent with regulations and therefore would not be covered under the FTCA's discretionary function exception to liability.

*Id.* at 1214. However, we held that because the NPS had not identified the risk of stepping on hot coals as a "serious safety hazard prior to [Summers'] injury," the NPS had complied with the mandates of the park's safety program. *Id.* at 1214–1215.

We then went on to the second step of the analysis to determine whether the failure to post signs warning of the danger of stepping on hot coals was the type of judgment "grounded in social, economic, or political policy" that the discretionary function exception is intended to shield. *Id.* at 1215. We rejected the NPS's argument that its sign policy was an exercise of discretionary judgment because there was no evidence that NPS's failure to post warnings was the result of a balancing of policy considerations. On the contrary, the NPS had not even known of the hazard and therefore could not have engaged in a judgment based on competing policy considerations. *Id.* We therefore held that the NPS's failure to warn visitors of the potential danger of stepping on hot coals was not covered by the discretionary function exception. *Id.* at 1217.

Blackburn's reliance on *Summers* to establish that the NPS lacked discretion in the present case is misplaced. In *Summers,* we held that the first step of the discretionary function exception test was met because the NPS had complied with the mandates of the park's safety program. *Id.* at 1214–15. Although we held that the discretionary function exception did not apply, our holding was based on the second step of the discretionary function exception test: that NPS's failure to identify and warn of the danger of stepping

on hot coals did not involve the exercise of judgment grounded in social, economic or political policy. *Id.* at 1215–17.

Furthermore, our statement in *Summers* that NPS manuals and Department of Interior guidelines mandate corrective action once a hazard is identified is dictum and is inconsistent with our holdings in *Valdez* and *Childers.* See *Valdez,* 56 F.3d 1177 (discretionary function exception applies to NPS's decision to not bring a natural hazard to the attention of the public); *Childers,* 40 F.3d 973 (discretionary function exception applies to NPS's decision to not post warning signs or close a trail despite the NPS's knowledge of potential hazard).

Finally, *Summers* is distinguishable from the present case on its facts. First, in *Summers,* the hazard had not been identified at the time of the accident; in the present case the hazard had been identified. Second, in *Summers,* no signs had been posted warning of the danger, and there was no evidence that the NPS had engaged in any policy decisions regarding warning; in the present case the NPS had considered different ways to address the hazard and made a decision to post the "DANGEROUS TO DIVE FROM BRIDGE" signs based on a balancing of NPS policies.[1]

Blackburn's reliance on *Faber v. United States,* 56 F.3d 1122, is similarly misplaced. Faber was injured when he dove approximately twenty feet from a rock ledge at the top of Tanque Verde Falls in Coronado National Forest which was managed by the United States Forest Service. *Id.* at 1123. Faber brought suit against the United States under the FTCA, claiming tort liability based on failure to warn of the existence of diving hazards. *Id.*

At the time of Faber's accident, there were four warning signs at the top of the falls. These signs warned generally of danger and natural hazards, and specifically warned of the danger of flash flooding and slippery rocks. The signs had been in place since at least 1985. *Id.*

---

1. The NPS's balancing of policy considerations and resulting decision to post the "DANGEROUS

TO DIVE FROM BRIDGE" signs is discussed more fully *infra* part IV.A.2.

Prior to the accident, the Forest Service had promulgated several "site management plans" for the falls. In May 1986, a plan was promulgated which stated the "need to re-evaluate the present management at Tanque Verde Falls has arisen due to accidents and the increase of resource damage." *Id.* (alterations omitted). In June 1986, a plan was promulgated which mandated the following action:

> Intensify the management for the area by constructing parking lots, trails, and helispots. Also, develop a sign plan, formulate an on-going media program to inform the public, and provide a presence at the Falls to verbally warn the public, enforce the laws, and record use patterns.

*Id.* at 1123–24. No new signs were added to the upper falls area between 1985 and the time of Faber's accident in 1991. Additionally, at the time of the accident, there were no written, verbal or other warnings specifically mentioning the hazards associated with diving from the falls.

We held that the discretionary function exception did not shield the Forest Service from suit.

> The Forest Service had no choice but to follow the June 1986 site management plan.... [T]he June 1986 plan listed three specific and mandatory measures that the Forest Service was to take in order to increase safety at the Falls. The Forest Service failed to implement all three of the requirements enumerated in the June 1986 plan. *Because the challenged conduct of the Forest Service was in direct contravention of a specifically prescribed federal policy, the discretionary function exception does not apply.*

*Id.* at 1126 (citations and alterations omitted) (emphasis added).

In the present case, in contrast to *Faber*, there was no specific plan or mandate requiring that additional action be taken. The only guidelines were the general policy guidelines and regulations under which the NPS operates. These guidelines and regulations, while setting out general goals and policies, necessarily involve an element of discretion in determining the precise manner in which

to meet these goals and policies. *See Valdez,* 56 F.3d at 1180; *Childers,* 40 F.3d at 976.

We hold that the general policy guidelines and regulations under which the NPS operated at the time of the accident did not impose mandatory duties of care, but instead created "broad policy goals attainable only by the exercise of discretionary decisions." *Valdez,* 56 F.3d at 1180.

### 2. *Considerations of Public Policy*

Even if the challenged Government conduct does involve an element of discretion, the discretionary function exception will not shield the challenged conduct unless it is based on considerations of public policy. *Valdez,* 56 F.3d at 1179.

In *Summers,* we held that the NPS's failure to warn visitors of the potential danger of stepping on hot coals was not shielded by the discretionary function exception because there was no evidence that NPS's failure to post warnings was the result of a balancing of policy considerations. 905 F.2d at 1217. The NPS had not even known of the hazard and therefore could not have engaged in a judgment based on competing policy considerations. *Id.*

In *Childers,* we held that the NPS's challenged conduct fell within the discretionary function exception to the FTCA. 40 F.3d at 976. We distinguished the case from *Summers* on the basis that in *Summers* the court "found no evidence the decisions were based on public policy concerns." *Id.* We found the case to be similar to two cases in which the Tenth Circuit found the discretionary function exception applicable "because the particular decisions not to post warning signs were part of an overall NPS plan based on a number of public policy factors." *Id.* (citing *Kiehn v. United States,* 984 F.2d 1100 (10th Cir.1993); *Johnson v. United States,* 949 F.2d 332 (10th Cir.1991)). The NPS had made a decision on how to manage the park in winter based on a number of competing public policy factors.

> Unable to maintain all the trails in the park, cognizant that posting warning signs would inadvertently attract visitors to unmaintained trails, and unable to post signs throughout the park, NPS could only de-

cide to close large portions of the park, or to keep the park open, provide visitors with information on the hazards, and take steps to discourage visitors from going to hazardous areas.

... [D]ecisions as *to the precise manner* in which NPS would warn the public as to trails which are left open, but unmaintained in the winter, clearly fall within the discretionary function exception. . . .

Park rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety. This decision was precisely the kind the discretionary function exception was intended to immunize from suit.

*Id.*

In *Valdez,* we also held that the challenged conduct fell within the discretionary function exception:

[T]he challenged conduct clearly implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards. . . .

The ... decision regarding which natural hazards should be brought to the attention of the public through pamphlets or brochures ... implicates public policy concerns. Faced with limited resources and unlimited natural hazards, the NPS must make a public policy determination of which dangers are obvious and which dangers merit the special focus of a warning brochure or pamphlet. In addition, too many warning brochures and pamphlets would inevitably reduce the impact of the individual warnings on the public. In this case, therefore, the NPS must balance the goal of public safety against competing

fiscal concerns as well as the danger of an overproliferation of warnings.

56 F.3d at 1180.

In the present case, the NPS made a decision to warn the public of the danger of diving from the bridge by placing signs stating "DANGEROUS TO DIVE FROM BRIDGE" on and around the bridge. The signs were intended to educate the public as to the hazard while at the same time not unduly inhibit visitor enjoyment of the area or endanger the riparian environment. Several alternative means of educating the public to the hazards of diving were considered and ultimately rejected as inconsistent with the mission of the NPS as well as potentially hazardous to visitors and the riparian environment. The alternatives that were ultimately rejected included placement of barriers on or along the bridge, and placing warning signs or other demarcation below the bridge in the river itself. The decisions regarding the election, placement and text of the signs were based on considerations of visitor enjoyment, preservation of the historical features of the bridge, the need to avoid a proliferation of man-made intrusions, and protection of wildlife and the general riparian environment.

■ Thus, as in *Childers* and *Valdez,* the NPS in the present case balanced competing policy considerations in determining how to warn the public of the hazard. The NPS determined that the best alternative was to place signs stating "DANGEROUS TO DIVE FROM BRIDGE" on and around the bridge. This decision is "precisely the kind the discretionary function exception was intended to immunize from suit." *Childers,* 40 F.3d at 976. We therefore hold that the discretionary function exception applies and that the Government is immune from tort liability.[2]

---

**2.** As to Blackburn's other claims—that NPS negligently designed and maintained the bridge and the watercourse under it, and failed to abate the hazards associated with diving off of the bridge— we also hold that the challenged conduct falls within the discretionary function exception. *See Valdez,* 56 F.3d at 1180; *Childers,* 40 F.3d at 976 (failure to maintain); *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1027 (9th Cir. 1989) (design decisions). The challenged con-

duct involves the balancing of considerations such as the danger such demarcations might pose to other users of the river, such as rafters, tubers and swimmers as well as fish and other wildlife; the likelihood that such demarcations would ultimately break loose and litter the environment due to flooding and currents in the river; and the aesthetic effect such demarcations would have on the natural beauty of the area.

### 3. *California River Resort Act*

Blackburn argues that the Government was required to comply with the California Resort Act, Cal. Health & Safety Code § 24050–24054,[3] and that its failure to comply subjects it to suit. In support of this argument, Blackburn cites the Assimilative Crimes Act ("ACA"), 18 U.S.C. § 13(a).[4] He claims that "[a]s a state criminal statute without a specific federal equivalent, the Resort Act is incorporated as express federal law pursuant to the ACA. This, in turn, established a mandatory duty under federal law for the NPS to comply with ... for purposes of the FTCA." We reject Blackburn's argument.

First, absent a waiver of sovereign immunity, the United States is not subject to liability under state statutes which are penal in nature. *See Missouri Pac. R.R. Co. v. Ault*, 256 U.S. 554, 563–64, 41 S.Ct. 593, 597, 65 L.Ed. 1087 (1921). There is nothing in the ACA which in any way suggests that Congress intended the ACA to constitute a waiver of federal sovereign immunity, subjecting the United States to prosecution for violations of state criminal statutes.

Second, under the intergovernmental immunity component of the Supremacy Clause to the United States Constitution, states may not directly regulate the Federal Government's operations or property. *Hancock v. Train*, 426 U.S. 167, 178–80, 96 S.Ct. 2006, 2012–13, 48 L.Ed.2d 555 (1976); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819). Application of the Resort Act in the present case would violate the Supremacy Clause by constituting a direct and intrusive regulation by the State of the Federal Government's operation of its property at Yosemite.

Third, the requirements of the River Resort Act for placement of warning signs and safety ropes would do violence to the main purposes and objectives underlying the National Park System: visitor enjoyment and resource protection. 16 U.S.C. § 1. Compliance with the Resort Act would destroy the visual beauty and riparian environment of the park and act as a detriment to rafters, boaters and riparian wildlife.

Finally, the Resort Act conflicts with federal policy and therefore cannot be incorporated into federal law pursuant to the ACA. The ACA will not assimilate a state law which is inconsistent with federal policies into federal law. *See Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 389–90, 64 S.Ct. 622, 625–26, 88 L.Ed. 814 (1944); *United States v. Sain*, 795 F.2d 888, 891 (10th Cir. 1986). Congress's policy and purpose in establishing Yosemite was to preserve its great natural beauty against despoliation, to the maximum extent possible, from manmade structures while at the same time, promote visitor enjoyment and protection. Application of the Resort Act to Yosemite would create not only an impossible administrative burden, but also massive despoliation of the natural and riparian environment within the

**3.** In 1991, the River Resort Act provided, in relevant part:

§ 24051.  Soundings for dangers
No person shall maintain a resort unless he carefully sounds the depth of water and locates the eddies and pools and determines the presence and nature of dangerous currents, sunken logs, rocks, and obstructions in the stream or river.
§ 24052.  Warning signs
No person shall maintain a resort unless signs indicating in plain letters the depth of water, the location of pools or eddies, and the presence and direction of currents of water are placed and maintained in the water during the season when bathing and swimming are permitted or invited.
§ 24053.  Safety ropes

No person shall maintain a resort unless safety ropes are stretched wherever necessary to show the line of eddies, pools, sunken obstructions, and other hidden dangers to bathers in the water.

**4.** The ACA provides:
Whoever within or upon any of the places now existing or hereafter reserved or acquired [by the United States Government], is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.
18  U.S.C. § 13(a).

park.[5] Faced with such an impossible administrative burden and such massive despoliation, it is likely that Yosemite, as well as every other federal recreational enclave within California which had a river running through it, would soon be closed to the public. It is hard to envision a more complete destruction of the purposes underlying the creation of Yosemite and the national park system.

## B. *Discovery Rulings*

■ Blackburn contends that the district court's discovery rulings improperly shifted the burden of proof regarding the application of the discretionary function exception and precluded discovery essential to the case. We disagree.

■ "The district court has wide discretion in controlling discovery." *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Rulings limiting the scope of discovery will not be overturned absent a clear abuse of discretion. *Id. See also Sopcak v. Northern Mountain Helicopter Serv.*, 52 F.3d 817, 818–19 (9th Cir.1995). "We will only find that the district court abused its discretion if the movant diligently pursued its *previous* discovery opportunities, and if the movant can show how allowing *additional* discovery would have precluded summary judgment." *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir.1994).

Subject matter jurisdiction is a threshold issue in the absence of which the court cannot proceed to hear other issues. "It is a recognized and appropriate procedure for a court to limit discovery proceedings at the outset to a determination of jurisdictional matters." *United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 79–80, 108 S.Ct. 2268, 2272–73, 101 L.Ed.2d 69 (1988).

In the present case, the district court limited the parties to 120 days of discovery on the issue of subject matter jurisdiction. During this time, Blackburn filed a motion to compel discovery. In response to this motion, the United States produced thousands of pages of documents. After these documents were produced, Blackburn did not bring to the attention of the district court any of the defects in discovery that he now argues. He did not file a motion for, or otherwise request, additional time. Although he claims that the discovery rulings "precluded proper inquiry and consideration of ... essential matters," he does not point to any discovery which he attempted but was prevented from conducting by the district court's rulings. He does not show how allowing additional discovery would have precluded summary judgment. Therefore, the district court did not abuse its discretion in limiting the scope and length of discovery. *See Qualls*, 22 F.3d at 844. *See also United States Catholic Conference*, 487 U.S. at 79–80, 108 S.Ct. at 2272–73; *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir.1988) (upholding district court's refusal to extend discovery beyond three months).

■ Furthermore, the district court's limitations on discovery did not shift the burden of proof regarding application of the discretionary function exception to Blackburn. It is true that the Government bears the burden of proving application of the discretionary function exception. *Faber*, 56 F.3d at 1124. However, once the Government met its burden, Blackburn, as the party opposing summary judgment, had to present sufficient evidence to withstand dismissal. Blackburn was required to come forward with facts to controvert the Government's evidence on the issue of subject matter jurisdiction. Because Blackburn failed to do so, the district court's grant of summary judgment was proper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

## V

The challenged conduct falls within the discretionary function exception to the

---

5. For example, Yosemite has over 1,000 miles of rivers and streams running through it. The public may bathe or swim in virtually every area of those waterways that run through the valley floor. Application of the River Resort Act to the park would mean that virtually every square inch of the 1,000 miles of rivers and streams would have to be sounded, signed, and otherwise marked for depth on a continuous basis, with determinations made as to the presence and nature of dangerous currents, sunken logs, rocks, and obstructions.

FTCA, and the Government is therefore immune from tort liability. The NPS's operation of Yosemite is not subject to regulation by the State pursuant to the River Resort Act and the ACA. The district court did not abuse its discretion in limiting the length and scope of discovery. The district court's order, dismissing the case for lack of subject matter jurisdiction is therefore affirmed.

AFFIRMED.