Alex **KAHAN and Nate
Minc, Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**No. 96–01168 BMK.**

United States District Court,
D. Hawaii.

April 27, 1999.

Mark F. Gallagher, Benjamin R.C. Ignacio, Law Offices of Ian L. Mattoch, Honolulu, Hawaii, for plaintiff.

Theodore G. Meeker, Assistant U.S. Attorney, Honolulu, Hawaii, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KURREN, United States Magistrate Judge.

Plaintiffs Alex Kahan and Nate Minc filed this Federal Tort Claims Act ("FTCA") action against defendant United States of America for damages for personal injuries they sustained when they were scalded by lava heated ocean water that washed over them at the point where a lava flow from the Kilauea Volcano enters the Pacific Ocean. The accident occurred in the Lae Apuki lava flow area of the Hawaii Volcanoes National Park on the island of Hawaii on August 23, 1994. Plaintiffs contend that the government was negligent in failing to make the eruption site reasonably safe for visitors, most importantly, by failing to maintain adequate barriers and signs at the eruption site and failing to warn of dangers associated with the site. The government denies negligence contending that the barriers and warning signs were in place and were adequate to warn visitors of the dangers of entering closed areas, that the decision to place signs and barriers and the manner of their placement is protected by the discretionary function doctrine, and that plaintiffs were comparatively and contributorily negligent by ignoring an open and obvious hazard.

Pursuant to 28 U.S.C. § 636(c), Fed. R.Civ.P. 73 and Local Rule 73.1, the parties consented to trial before a United States Magistrate Judge. Having carefully considered the evidence presented at trial and the arguments of counsel, the court directs the Clerk of Court to enter judgment in favor of the government and against plaintiffs. The court's findings are as follows:

## FINDINGS OF FACT

On August 23, 1994 plaintiffs, David Finkelstein, their wives, and their children visited the Hawaii National Park on the island of Hawaii. They arrived at the main gate at approximately 2:00 p.m., where they paid an entrance fee and received a park brochure which included a map, information on the park, and safety tips. Among the safety tips in the brochure is a statement that visitors are to stay on marked trails and heed warning signs.

After a brief stop at the Visitor Center and the Volcano House, they viewed the sights near the entry of the park, including the Thurston Lava Tube. The families then drove down the Chain of Craters Road which runs through the park and eventually ends at an active flow at the Lae Apuki area, approximately 23 miles from the park entrance station.

At the time of the accident, in the Lae Apuki area, the National Park Service ("NPS") established a safe observation area for viewing the lava flow entering the ocean. The observation area was about one-half mile from the point where the lava entered the ocean. The observation area was reached via two established trails from the Chain of Craters Road, marked with trail signs and orange cones to the observation area.

The NPS also established a closed area boundary from a point north of the end of the Chain of Craters Road, extending east to the viewing area and then south along a cliff line. The boundary was marked with a yellow rope held up with wooden stanchions, orange cones and signs indicating that the area beyond the rope line was "closed" and "hazardous". These signs were placed on wooden posts about two feet above the ground. Other signs placed adjacent to the parking area and trails warned of hazardous fumes, steep cliffs,

rough surface and hot lava. One large yellow sign in particular placed near the entrance to the trails stated the following warning: "CAUTION—AVOID THE STEAM PLUME—IT IS HAZARDOUS TO YOUR HEALTH AND MAY BE LIFE–THREATENING—The plume contains hydrochloric acid and volcanic glass particles which can irritate eyes and skin and cause respiratory distress."

Various signs were located at the observation area, including signs indicating that the lava field beyond the observation area was closed and hazardous, a sign providing that persons in the closed area are subject to arrest, and a three foot square yellow sign with a drawing of a person falling from the collapse of the surface stating: "EXTREME DANGER BEYOND THIS POINT—Collapse of Lava Bench Without Warning Causing Violent Steam Explosions and Ocean Surge."

The park rangers testified that the ledges formed at the active lava entry points are extremely hazardous because the surface is so unstable. These "benches" collapse regularly as the lava continues to build up on and around them, taking large pieces of the immediate coastline into the water with them. That is a principle reason why the NPS roped off and closed the area beyond the trails and placed signs at the observation area indicating that the public is prohibited from entering the bench area.

Plaintiffs reached the end of the Chain of Craters Road between 3:30 and 4:30 p.m. After parking their cars, they began walking toward the end of the road where an older lava flow crossed the road. Before proceeding further, they took several pictures. Plaintiffs then noticed a group of people on the lava field, and walked out to join them.

Plaintiffs, their families, and friends who were with them testified that they did not know that they were walking into a closed area at the time they approached the group of people on the lava field. They indicated they did not observe "closed area" or other warning signs and did not pass through any type of barricade or boundary. Plaintiffs and others in their group said they saw the rope. However, they stated it was on the ground and not attached to any stanchions.

Plaintiffs' testimony that they did not know they were walking into a closed area when they walked away from the end of the Chain of Craters Road is not credible for several reasons. First, plaintiffs' photographs taken before they walked onto the lava field show some of the "closed area" and other warning signs. These photographs also clearly show a portion of the rope barrier. Second, the aerial photographs taken by Ranger Neil Akana the day following the accident show that the entire rope barrier was in place. Third, the court finds credible the testimony of the rangers indicating that the signs and the rope barrier shown in various photographs presented by the government were in place on the day of the incident. Fourth, plaintiff Minc admitted on cross examination that he saw some of the rope barrier and certain signs, although he indicated he did not read them. Moreover, plaintiff Minc and perhaps even plaintiff Kahan admitted to Ranger Akana during the investigation of the incident that they knew they were proceeding into a closed area. Finally, Michelle Minc, plaintiff Minc's daughter, indicated that when she returned to the vehicles from the lava field, she walked under the rope barrier. Her testimony supports the conclusion that the rope barrier was in place on the day of the incident.

Based on a careful review of the photographs taken of the area and the testimony presented, the court finds that plaintiffs either knew or clearly should have known they were entering a closed area when they walked out onto the lava field. Plaintiffs probably walked under the rope barrier and simply ignored the warning signs in the area.

A short time after walking onto the lava field, plaintiffs' group proceeded to walk towards the ocean where a large steam

plume was rising. Shortly thereafter, everyone except for plaintiffs and David Finkelstein returned to the vehicles. Upon reaching the beach, plaintiffs proceeded down a steep area to the black sand beach. Mr. Finkelstein elected to stay on top and take photographs. Plaintiffs testified that they saw the enormous steam plume before reaching the beach area. Mr. Finkelstein also stated he noticed that the ground was warm as they approached the flow entry point into the ocean. Plaintiffs' photographs and their testimony establish that they were very close to the steam plume and the lava entry point, approximately 25 to 50 feet from the plume, when the incident occurred. The photographs also show that they were in the "bench" area and that they could see molten lava entering the ocean along with steam explosions a short distance away. After taking photographs on the beach, and as they were preparing to return to the lava field, a wave of superheated water struck plaintiffs, severely scalding them. Plaintiff Kahan received first and second degree burns from his knees down. Plaintiff Minc fell when the wave hit, and he received first and second degree burns from his chest down. Plaintiffs slowly made their way back to their vehicles. Their families drove them back to park headquarters where they reported the incident and received medical attention. As a result of the incident, plaintiffs sustained severe burn injuries and required extensive medical treatment.

As noted above, plaintiffs probably arrived at the end of Chain of Craters Road between 3:30 and 4:30 p.m. They testified that they did not see any rangers at the site when they were there. The rangers, however, stated that they were in the area that afternoon. The rangers do not recall seeing anyone in plaintiffs' group. The rangers clearly were not present when plaintiffs returned to their vehicles after the incident. In light of all the circumstances, the court finds that the rangers were not in the area when plaintiffs arrived.

## CONCLUSIONS OF LAW

Original jurisdiction is based on the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 et seq. Venue is proper pursuant to 28 U.S.C. § 1391(e)(2) as the events from which this case arise occurred within this district.

■■■ The FTCA allows recovery against the United States for injuries caused by the negligent acts or omissions of a federal employee acting in the scope of employment. 28 U.S.C. §§ 1346(b), 2674. This waiver of immunity is limited "by the discretionary function exception, which bars claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.' " *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir.1996) (quoting 28 U.S.C. § 2680(a)). This exception "restores the government's immunity in situations where its employees are carrying out governmental or 'regulatory' duties." *Id.* A two-step analysis is employed to determine whether the challenged conduct falls within the discretionary function exception. First, the court must determine "whether the challenged actions involve an element of judgment or choice[,]" as opposed to mere adherence to a "federal statute, regulation or policy" which prescribes a specific course of action. *Id.* If judgment or choice is involved, the second step is to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* The exception protects only those "actions and decisions based on considerations of public policy." *Id.*

■■■ For the following reasons, the court finds that the discretionary function exception applies to this case and therefore, the government is immune from liability. Park officials used their discretion in determining whether to erect signs, warnings, and barriers, and deploy rang-

ers, and if so, where to place them, in accordance with the following documents. First, the NPS Sign Manual, January 1988 edition, states:

> The decision to utilize a particular sign at a particular location requires the professional judgment of the park manager—drawing upon available guides, resources, and traffic safety engineering expertise- and considering a variety of other factors, such as the appearance of the road as a whole and its relationship to the natural and/or historical environment through which it passes. It is important in this regard, too, that such decisions bear in mind long standing NPS policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure for the safety of park visitors.

Exhibit 18, Sign Manual, at 1–1. Second, Chapter 5 of NPS–50, Loss Control Guidelines, sets forth the inspection and hazard abatement process to be utilized by park personnel. *See* Exhibit 5, NPS–50, Loss Control Guidelines, Ch. 5. Chapter 5 provides for periodic inspections to identify hazards and for immediate corrective or preventive action if an imminent hazard is identified. *Id.* at 1–5. Third, Chapter 22 provides "program requirements for protecting the visiting public from recognized hazards[.]" Exhibit 5, NPS–50, Loss Control Guidelines, Ch. 22, at 1. These requirements include identifying hazards that have caused or may cause injury to visitors, providing signs and/or brochures alerting the public to these hazards, including safety messages in talks given by rangers during formal programs at a particular site, and review by the Safety Officer for a determination of whether the signs are "appropriate for the area ... and if [they] are in good repair." *Id.* at 2–3. James Martin, the Park Superintendent, testified that NPS–50 set forth guidelines to be considered by park officials in the performance of their jobs, rather than specific rules to be followed in all situations. No rules, regulations, or re-

ports setting forth specifics concerning the placement and content of signs and barriers at hazardous areas were introduced into evidence.

In *Blackburn,* the Ninth Circuit reviewed Chapters 5 and 22 of NPS–50 and found that they "necessarily encompass an element of discretion in deciding how and when to warn the public of known dangers." *Blackburn,* 100 F.3d at 1431 (reviewing the same policies in connection with an alleged failure to warn of a natural hazard at a · national park). The court further stated that:

> Although the policy manuals outline general policy goals regarding visitor safety, they do not set out the specific means by which the NPS employees are to meet these general goals. Furthermore, the policy manuals' broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards.

*Id.* (citing *Valdez v. United States,* 56 F.3d 1177, 1180 (9th Cir.1995)) (exception applies) and *Childers v. United States,* 40 F.3d 973, 976 (9th Cir.1995) (exception applies because same policies require park personnel to use judgment and in doing so, personnel must balance public policy objectives including resource allocation, visitor safety, and visitor access).

In urging the court to find that a failure to warn is not encompassed by the discretionary function exception, plaintiffs rely upon cases that are easily distinguished. In *Summers v. United States,* 905 F.2d 1212, 1216 (9th Cir.1990), the Ninth Circuit found that the discretionary function exception did not apply to the NPS's failure to warn of hot coals on a park beach because the evidence clearly showed that consideration of visitor safety was not a consideration in the formulation of policy on fire rings in beach areas. Visitor safety was not only considered, but balanced

against visitor access in the instant case. In *Faber v. United States*, 56 F.3d 1122, 1126 (9th Cir.1995), the court determined that the exception did not apply when park officials failed to warn of the hazards from diving off a waterfall. In that case, the NPS identified diving from the waterfall as a particular hazard following frequent accidents, promulgated a plan mandating specific methods to warn of this hazard, and then failed to comply with its own plan. *Id.* No such policies or plans were violated in the instant case. Based on the foregoing, the court finds that the first step of the discretionary function analysis is met.

■ The second step requires the court to determine whether decisions concerning the content and placement of signs and barriers near the eruption site are based on considerations of public policy. The guidelines quoted above identify policies of minimal intrusion upon the natural or historic setting in National Park System areas, avoidance of unnecessary proliferation of signs, and a commitment to provide for the safety of park visitors. Mr. Martin testified that the NPS strives to provide opportunities for maximum viewing of the eruption site, without spoiling its aesthetics with too many signs and barriers. On the other hand, he testified that the NPS provides those warnings, signs, and barriers that are essential to protecting the safety of park visitors. These policies guided park officials in their decisions concerning the placement, method, and content of signs, warnings, and barriers all around the eruption site. Mr. Martin conceded that park officials knew that in rare cases, individuals might not heed the signs, warnings, and barriers, but that on the whole, the viewing public respects boundaries and warnings. Based on the foregoing, the court finds that the NPS balanced competing policy concerns in determining whether and how to warn of hazards associated with the eruption site. Accordingly, the discretionary function exception applies and precludes liability against the government for plaintiffs' injuries.

■ Alternatively, even if the exception did not apply, the government would not be liable. Pursuant to the FTCA, the liability of the United States is determined in the same manner as if the United States were a private individual under the law of the state where the incident occurred. 28 U.S.C. §§ 1346(b), 2674; *Cameron v. Janssen Bros. Nurseries, Ltd.*, 7 F.3d 821, 825 (9th Cir.1993). Under Hawaii law, the elements for a cause of action in negligence are: (1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage. *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742 P.2d 377, 383 (1987). Under Hawaii law, a landowner has a duty to use reasonable care for the safety of all persons reasonably anticipated to be on the premises. *Gibo v. City & County of Honolulu*, 51 Haw. 299, 301, 459 P.2d 198 (1969). Specifically:

> if a condition exists upon the land which poses an unreasonable risk of harm to persons using the land, then the possessor of the land, if the possessor knows, or should have known of the unreasonable risk, owes a duty to persons using the land to eliminate the unreasonable risk, or adequately warn users against it.

*Corbett v. Association of Apartment Owners*, 70 Haw. 415, 417, 772 P.2d 693 (1989). This duty of care "does not require the elimination of known or obvious hazards which [a person] would reasonably be expected to avoid." *Friedrich v. Dept. of Transp.*, 60 Haw. 32, 36, 586 P.2d 1037, 1040 (1979) (citing Restatement (Second) of Torts § 343A). The *Friedrich* court noted its prior ruling in *Geremia v. State*, 58 Haw. 502, 573 P.2d 107 (1977), in which it determined that when a landowner invites the public to use certain facilities, it assumes "a duty to make apparent . . . any

danger which its invitation otherwise would have impliedly represented to be nonexistent. The obviousness of a risk substitutes for an express warning and satisfie[s] this obligation." *Id.* Thus, under Hawaii law, where a hazard is both known and obvious, a landowner has no duty to warn. *See id.*[1] To the extent a hazard is not one a reasonable person, exercising ordinary attention, perception, and intelligence could be expected to avoid, a landowner is required only to provide adequate warning to those reasonably anticipated to use the premises.

■■■■ As discussed below, the court finds that the hazard of being within 25 to 50 feet of an enormous steam plume where flowing lava entered the ocean, was open and obvious. Additionally, to the extent the extremely hazardous nature of the eruption site was not open and obvious, the NPS met its duty to provide adequate warning.

The NPS provided a brochure which included clear information about safety, particularly about staying on marked trails and heeding warning signs. In addition, the NPS established trails to the observation area and a closed area boundary. Signs at the boundary indicated that the area beyond was closed and hazardous. Warning signs placed near the parking area and trails informed visitors of the extreme dangers presented by the regular collapse of the bench areas. The signs informed readers that in addition to taking large pieces of coastline into the ocean, these collapses cause violent steam explosions and ocean surges. The signs also warned of the danger of breathing the steam plume, explicitly noting that the plume contains hydrochloric acid and volcanic glass particles that can irritate eyes and skin, cause respiratory distress, and may be life-threatening. Plaintiffs argue unpersuasively that these warning signs and barriers were not adequate because they were not as sturdy and prevalent as those at the Thurston Lava Tube and the crater at Volcano House. Unlike those more established areas, the eruption site changes daily. Constructing permanent fences or other structures at the eruption site would be both unfeasible and unwise.

■■■■ The government's duty was only to provide adequate warning sufficient to put a reasonable person on notice of a hazard. The NPS clearly met its duty to warn plaintiffs to stay out of closed areas, particularly the bench area, and away from the steam plume. The NPS had no duty to warn of every possible harm that could befall one who ventured into that area. The court is quite sure that plaintiffs did not expect to encounter superheated ocean water. However, in light of the explicit warnings to stay away from that extremely hazardous area, the NPS was under no duty to provide this additional warning. Furthermore, the NPS did not have a duty to post rangers at the site. Had the rangers observed plaintiffs entering the closed area, there is little doubt that they would have informed plaintiffs that the area was closed to visitors. As discussed above, plaintiffs knew that they were walking in a closed area. Thus, the absence of rangers when plaintiffs arrived at the site is of no consequence.

■■■■ Moreover, the hazard of being in the bench area, and most importantly, near the enormous steam plume, was open and obvious. Plaintiffs were well aware that they were in close proximity to a powerful force of nature. During cross-examination, Minc admitted that he understood that boiling water produces steam and that he knew the water was hot where lava entered the ocean. In addition, Minc testified that because the plume was blowing away from them, they encountered no noxious fumes. He further testified that one reason they did not believe they were placing themselves in danger is that the

---

1. Similarly, in *Josue v. Isuzu Motors America, Inc.,* 87 Hawai'i 413, 416–19, 958 P.2d 535, 538–40 (1998), the Hawaii Supreme Court determined that a truck manufacturer has no duty to warn of the open and obvious danger of riding unrestrained in the bed of a pickup truck.

plume was blowing away from them and they had no indication that it might suddenly shift its direction. Rather than demonstrate a lack of awareness of the hazard, these statements show that plaintiffs understood that the plume itself posed an open and obvious hazard.

The court's conclusion is bolstered by the discussions of open and obvious hazards, notwithstanding a particular plaintiff's behavior or awareness, in both *Maneely v. General Motors Corp.*, 108 F.3d 1176, 1180 (9th Cir.1997) and *Josue*, 87 Hawai'i at 416–18, 958 P.2d at 538–40. In *Maneely*, the Ninth Circuit determined that riding in the bed of a pickup truck is an open and obvious danger, even though many people ride in the beds of pickup trucks. The court stated:

> While we recognize that some individuals, including Appellants, do ride in pickup cargo beds, this does not mean that the ordinary product user is ignorant of the accompanying risks. Unfortunately, ordinary intelligent people defy obvious dangers all the time[.]

*Id.* In *Josue*, the Hawaii Supreme Court likewise determined that riding unrestrained in the bed of a pickup truck is an open and obvious hazard, notwithstanding: (1) the seventeen year-old plaintiff's testimony that he did not perceive the danger; (2) the results of a statistical study showing that 51% of teenagers on Oahu believed they would be safe in the bed of a pickup if they kept their bodies inside and held on; and (3) the opinion of plaintiff's human factors expert that the consuming public, especially teenagers, does not adequately appreciate the danger of this behavior. 87 Hawai'i at 418, n. 5, 958 P.2d at 540, n. 5. As these cases show, how a person behaves in the face of known dangers does not negate the fact that the dangers are open and obvious.

Finally, under Hawaii law, if a plaintiff is found to be over fifty percent responsible for his own injuries, the doctrine of comparative negligence bars recovery for those injuries, regardless of any negligence by a defendant. Haw.Rev.Stat.

§ 663–31. The court finds that because plaintiffs knowingly entered a closed area with an open and obvious hazard, not only was their behavior unreasonable, but they alone are responsible for their injuries. Minc's testimony concerning the plume shows not only that they were aware of the hazards associated with being close to the plume, but also that they took a calculated risk to get as close to that open and obvious danger as they could without encountering harm. Plaintiffs introduced the opinions of Mr. Gill, their human factors expert, that plaintiffs neither knew that they were walking in a closed area, nor that they were placing themselves in danger and therefore, their behavior was entirely reasonable. Mr. Gill's opinions are not persuasive because they are based on assumptions contrary to the factual findings of this court. For example, Mr. Gill assumed that plaintiffs failed to encounter signs warning of dangers or rope barricades and signs marking a closed area. As discussed above, this court finds otherwise. In accordance with the foregoing, the court concludes that plaintiffs knew or reasonably should have known that they were placing themselves in danger by their actions and therefore, their actions were not reasonable.

The court recognizes that as a result of this accident, plaintiffs suffered tremendous physical and emotional pain. Nevertheless, under the discretionary function exception, the government is immune from liability. Furthermore, even if the exception did not apply, because the NPS was not negligent, the government is not liable to plaintiffs. Finally, because plaintiffs are solely responsible for their injuries, their claims must fail.

IT IS SO ORDERED.