**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN A. SOLDANO, an individual;
DENISE SOLDANO, an individual,
     *Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA; UNITED
STATES DEPARTMENT OF THE
INTERIOR; NATIONAL PARK SERVICE;
SUPERINTENDANT YOSEMITE
NATIONAL PARK,
     *Defendants-Appellees.*

No. 03-17391

D.C. No.
CV-01-05462-LJO

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Magistrate Judge, Presiding

Argued and Submitted
April 4, 2006—San Francisco, California

Filed July 12, 2006

Before: Alfred T. Goodwin, Betty Binns Fletcher and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Raymond E. Brown, Law Offices of Federico C. Sayre, Santa Ana, California, for the plaintiffs-appellants.

Kristi C. Kepetan, Assistant United States Attorney, Fresno, California, for the defendants-appellees.

**OPINION**

FISHER, Circuit Judge:

John Soldano and his wife, Denise, sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA"), for damages arising out of a serious motorcycle accident that occurred on a major road in Yosemite National Park. The district court granted summary judgment against the Soldanos, finding that their claims of governmental negligence failed for lack of evidence or were barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). We affirm in part, but reverse the district court's application of the discretionary function exception to the Soldanos' claim that the government failed to set a safe speed limit at the accident site.

*FACTS*[1]

**A. The Accident**

On June 23, 1998, John Soldano was driving his new

---

[1]The facts are undisputed.

Harley-Davidson motorcycle west on the two-lane Big Oak Flat Road in Yosemite National Park, a road familiar to Soldano, who had driven it many times. Sitting behind him as his passenger was his wife, Denise. They were cruising between 30 and 35 m.p.h., consistent with the road's 35 m.p.h. speed limit.

As the Soldanos came around a bend in the road approaching the Cascade Creek Bridge, they were startled to find a van stopped in their lane. The van was waiting to turn left across the road's double, solid yellow lines to enter the Cascade Creek Bridge vista point adjacent to the road. John Soldano claims he attempted to brake, but had to veer into the eastbound lane and oncoming traffic when he realized he had insufficient room to stop before colliding with the van. As a result, the Soldanos crashed head-on into another van, and John Soldano suffered severe injuries rendering him a paraplegic. Soldano was also cited for improper crossing of double, solid yellow lines.

In a deposition, Soldano testified that the collision occurred about one minute after he exited the Big Oak Flat Road's second tunnel. He described the road as curving around a large, solid granite mountain on his right just before the location of the collision, and said that it was the granite mountain that obstructed his vision of the stopped van. He did not identify any road or hillside maintenance issues that contributed to the accident.

In April 2001, the Soldanos sued the United States under the FTCA. Their complaint alleged that the government, through the U.S. Department of the Interior, National Park Service and Superintendent of Yosemite National Park, caused or contributed to the collision by improper design of, and failure to maintain, the road and adjacent area. The Soldanos specifically alleged that the location of the collision "constituted a dangerous condition and concealed trap or hidden hazard causing [the Soldanos] to be surprised by stopped

traffic." They faulted the government for the negligent placement of traffic signs, among other things, and alleged that the dangerous condition of the roadway was the proximate cause of their injuries. They sought damages for past and future medical expenses, lost earnings and earning capacity, emotional distress and loss of consortium. After a hearing, the district court granted the government's motion for summary judgment, finding that a lack of evidence or the discretionary function exception to the FTCA barred all of the Soldanos' claims.

## B. The Road and Park Policies

The Big Oak Flat Road ("Road") is a two-lane road with 11-foot wide lanes and a northwest to southeast orientation. It is one of the principal routes for traffic in and out of the park and is heavily traveled during the summer tourist season. The segment of the Road where the accident occurred includes three tunnels, three bridges and the Cascade Creek Bridge vista point. Eight other pullouts punctuate the Road, which was constructed between 1937 and 1940 and has been neither redesigned nor reconstructed since its creation.

The Road is a part of the national park system of roads. In 1968, the National Park Service created the *Park Road Standards* ("Standards") to establish policies for the design and construction of the nation's park roads. In 1984, it prepared new standards to be applied "as existing roads are reconstructed or when new roads are constructed." The 1984 Standards state that "[i]n most parks, a road system is already in place, having been constructed in accordance with the National Park Service Policies." The Standards "are intended to be applied uniformly to both new construction and reconstruction of park roads on a Servicewide basis to the extent practicable, based on projections of actual, or planned and controlled use," and they acknowledge that "[o]n rehabilitation, restoration and resurfacing (3-R) projects, the standards applicable to new construction and reconstruction will in

some instances not be attainable." Finally, the 1984 Standards set forth the purpose of national park roads:

> [P]ark roads are designed with extreme care and sensitivity with respect to the terrain and environment through which they pass — they are laid lightly onto the land.
>
> Each segment of every park road should relate to the resource it traverses in a meaningful way and should constitute an enjoyable and informative experience in itself while providing the visitor the utmost in visual experience. . . . A park road should be fundamentally designed to maintain an overall continuing sense of intimacy with the countryside or area through which it passes.
>
> The purpose of park roads remains in sharp contrast to that of the Federal and State highway systems. Park roads are not intended to provide fast and convenient transportation; they are intended to enhance visitor experience while providing safe and efficient accommodation of park visitors and to serve essential management access needs.

The placement and use of signs in Yosemite is similarly governed by Park Service policies, in particular those set forth in the *National Park Service Sign Manual* ("Sign Manual"). The Sign Manual delineates a number of factors that park managers are to consider in determining where to place signs. Managers should weigh such potentially competing ends as minimal intrusion, avoidance of unnecessary proliferation of signs and the safety of visitors in deciding whether to use a particular sign at a particular location.

The Yosemite National Park Superintendent, Michael J. Tollefson, has averred that the Park Service's overall road policy decisions made pursuant to the Standards involve bal-

ancing preservation of natural resources, visitor enjoyment and safety and the Park Service's limited financial and human resources. The Superintendent has further stated that balancing such considerations requires the exercise of discretion, and that decisions on the Road's design and construction, including the placement of scenic vistas and signs on it, are not governed by mandatory statutes, regulations or policies, but rather by noncompulsory policies as set forth in the 1984 Standards and the Sign Manual.

## STANDARD OF REVIEW

We review the district court's summary judgment de novo. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). "We must determine, viewing the evidence in the light most favorable to . . . the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olson v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## DISCUSSION

This appeal turns on the resolution of two questions: (1) whether the district court properly rejected the Soldanos' claim that the Road was negligently maintained, as not supported by admissible evidence; and (2) whether the court erred in determining that the discretionary function exception shields the government from liability for the rest of the Soldanos' claims.

## A. Negligent Maintenance

The Soldanos claim that the government's failure properly to maintain the site of the accident was a proximate cause of their injuries. More specifically, they contend that overgrowth along the road at the site of the accident made the Road's 35 m.p.h. speed limit too high, in violation of minimum specifications set forth in the Standards. In support of their claim,

the Soldanos' expert witness, Ronald M. Shields, a traffic engineer, stated:

> The nearly vertical upward sideslope for the westerly road direction significantly reduces the available sight distance . . . to 180 feet based on the CalTrans highway design charts. Actual sight distance observed [in 2002] at the westbound curve approaching the Cascade Creek Bridge was 135 feet as a result of vegetation blocking the line of sight. Pursuant to the 1984 edition of *Park Road Standards*, the reduction of sight distance caused by the vegetation would place the maximum allowable design speed below 25 miles per hour. . . .
>
> If the design speed (and corresponding speed limit) had been reduced and the vegetation had been maintained to increase the stopping sight distance, John Soldano would have had sufficient time to stop before reaching the rear of the stopped van and would not have been required to swerve into the oncoming lane of traffic.

[1] Shields' report is the only evidence the Soldanos presented concerning the state of vegetation and its effect on the Road's safety. The report, however, does not establish that vegetation was overgrown or even existed in 1998, because Shields' conclusions were based on his observations in 2002. The district court correctly recognized, therefore, that "[t]he Soldanos provide no evidence to describe or depict the vegetation at issue and how it obscured vision at the time of the collision" and instead "merely rely on [their expert's] general statements of vegetation overgrowth without supporting underlying facts." The same deficiencies prevent Shields' declaration from calling into question John Soldano's own statement that it was the "rock wall" that blocked his view.

[2] Accordingly, the district court did not err in granting summary judgment to the government on the Soldanos' negli-

gent maintenance claim. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986).

## B. Negligent Design, Placement of Signs and Speed Limit

The Soldanos also allege that the Road was negligently designed at the site of the accident. First, they claim that the Park Service negligently designed the Road by omitting signs warning of the danger of vehicles stopped on a blind curve. Second, they contend that the Road's speed limit was negligently set too high relative to its design, because the Standards permit a 35 m.p.h. speed limit only where a sight distance meets or exceeds 225 feet. Here, the nearly vertical "sideslope" of the Road reduces the sight distance of a vehicle in the position of the Soldanos' to 180 feet (according to the Soldanos' expert's interpretation of California Department of Transportation highway design charts).[2]

**[3]** Given the circumstances of the accident and their expert's analysis, the Soldanos have presented evidence sufficient to create triable issues with respect to their claims that the Park Service's design of the Road required warning signs and a lower speed limit at the accident site. We therefore turn to consider whether the district court erred in finding that the discretionary function exception to the FTCA bars these claims.

### 1. *Discretionary function exception*

**[4]** "A party may bring an action against the United States only to the extent that the government waives its sovereign immunity." *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995). The FTCA waives the government's sovereign

---

[2]As discussed previously, although the expert Shields opined that the sight distance was further reduced to 135 feet due to overgrown vegetation, there was no evidence of the existence or state of vegetation as of 1998.

immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment. *Id.* Thus, the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

**[5]** The FTCA's waiver of immunity is limited, however, by the discretionary function exception, which bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "restores the government's immunity in situations where its employees are carrying out governmental or 'regulatory' duties," *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995), and it "marks the boundary between Congress' willingness to impose tort liability on the United States and the desire to protect certain decision-making from judicial second-guessing." *Conrad v. United States*, 447 F.3d 760, 764 (9th Cir. 2006) (citing *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)).

To determine whether the challenged conduct falls within the discretionary function exception, we employ a two-step analysis. First, we determine "whether the challenged actions involve 'an element of judgment or choice.' " *Valdez*, 56 F.3d at 1179 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). Our inquiry looks to "the nature of the conduct, rather than the status of the actor," and the discretionary element is not met where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536 (internal quotation marks and citation omitted). In such event, our inquiry is at an end, and the discretionary function exception does not apply because "the employee has no rightful option but to adhere to the directive." *Id.*

**[6]** However, if an element of choice or judgment is involved, we move to the second step of the analysis and determine " 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' " *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). The exception " 'protects only governmental actions and decisions based on considerations of public policy.' " *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537). In other words, only those decisions "grounded in social, economic, and political policy" will be protected by the discretionary function exception. *Childers v. United States*, 40 F.3d 973, 974 (9th Cir. 1994). The exception "will apply if the discretionary decision made is a permissible exercise of policy judgment," *Conrad*, 447 F.3d at 765, even if the decision is an abuse of the discretion granted. *See* 28 U.S.C. § 2680(a).

We acknowledge that the distinction between protected and unprotected decisions can be difficult to apprehend, but this is the result of the nature of governmental actions — they fall "along a spectrum, ranging from those 'totally divorced from the sphere of policy analysis,' such as driving a car, to those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (citing *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002) (additional citation omitted)).

**[7]** Notwithstanding the occasionally fine line between protected and unprotected activities, general principles exist. In particular, we have declined to find the discretionary function exception applicable "where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations." *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (internal alteration omitted). In *ARA Leisure Services*, the Park Service's decision to design the Denali Park Road in Alaska without guardrails was grounded in social, economic and political policy, but the

Park Service's failure to maintain a pass on that road in safe condition was not. There was "no clear link between Park Service road policies and the condition" of the pass, so the government's failure to maintain the road fell "in the category of 'ordinary "garden-variety" negligence' " that the FTCA did not immunize from suit. *Id.* at 195-96 (quoting *Aslakson v. United States*, 790 F.2d 688, 693-94 (8th Cir. 1986)).

In *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), we similarly held that the Park Service's failure to identify and warn of the danger of hot coals to barefoot visitors to a park beach "resemble[d] more a departure from the safety considerations established in Service policies, akin to the situation[ in] . . . *ARA*, . . . than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors." *Id.* at 1216. And in *Seyler v. United States*, 832 F.2d 120 (9th Cir. 1987), the discretionary function exception did not preclude a claim against the Bureau of Indian Affairs by a motorcyclist injured on an Indian reservation road that had no posted speed limit signs. The decision not to provide such signs was not "of the nature and quality that Congress intended to shield from tort liability," and nothing in the record demonstrated that the failure to post any speed limits actually resulted from a protected policy decision. *Id*. at 123.

Most recently, in *Oberson v. U.S. Dep't of Agriculture*, 441 F.3d 703 (9th Cir. 2006), we held that the Forest Service, in raising the speed limit on a snowmobile trail to 45 m.p.h. without first assuring the safety of travel up to that speed, did not make a "decision grounded in public policy or . . . competing policy considerations." *Id.* at 709. Although the decision to open a particular trail or to adopt a 45 m.p.h. speed limit *after* warranting the safety of that speed was protected, "the Service c[ould] not claim that its *failure to warn of hazardous conditions at that speed* [wa]s protected by the discretionary function exception." *Id.* at 711 (emphasis added). This was especially true given the absence of evidence that the

agency's failure to post a warning or to remedy a known hazard was the product of a policy choice. *Id.* at 712.

**[8]** On the other hand, we have held decisions about the implementation of safety considerations on park roads and trails to be protected, where circumstances clearly showed they were the result of a judgment grounded in social, economic and political policy. In *Valdez v. United States*, Valdez was rendered quadriplegic when he fell down a waterfall in Kings Canyon National Park. Valdez argued that the regulations in Park Service policy manuals were mandatory, such that the Park Service lacked any choice over the challenged conduct. 56 F.3d at 1179-80. We rejected his argument:

> While the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which NPS employees meet these goals necessarily involves an exercise of discretion. These guidelines can be considered mandatory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions.

*Id.* at 1180. Because the challenged conduct "clearly implicate[d] a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards," it fell within the discretionary function exception. *Id.*

Likewise, *Childers v. United States* involved a FTCA suit brought by the parents of David Childers, who died in a winter hiking accident in Yellowstone National Park. To determine whether the Park Service's failure to post warning signs on the fatal trail was protected, we considered the statutes and regulations under which the Park Service operated and held that the decision as to the posting of warning signs was left in the hands of Park Service rangers. 40 F.3d at 974-76. "Their decisions [we]re policy-based, requiring them to bal-

ance access with safety, and take into account conservation and resources in designing area plans and making individual trail determinations." *Id.* at 976.

Finally, in *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996), we held that the discretionary function exception barred a plaintiff's claim that the Park Service negligently failed to warn of the danger of diving off a bridge in Yosemite National Park. As in *Valdez* and *Childers*, the statutes and regulations under which the Park Service operated encompassed an element of discretion in deciding how and when to warn the public of known dangers:

> Although the policy manuals outline general policy goals regarding visitor safety, they do not set out the specific means by which the NPS employees are to meet these general goals. Furthermore, the policy manuals' broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards. *See Valdez,* 56 F.3d at 1180; *Childers,* 40 F.3d at 976.

*Id.* at 1431.

**[9]** Here, we conclude that the discretionary function exception bars the Soldanos' claim that the Park Service negligently designed the Road without warning signs at the site of the accident. The exception does not, however, bar their claim that the Park Service negligently set the speed limit for the Road, relative to the Road's design. Rather, that decision was circumscribed by objective safety criteria and was not the result of a policy decision of the kind protected by the discretionary function exception.³ We address these claims in turn.

---

³To the extent this court has suggested otherwise, it has done so only in dictum. In *Oberson,* 441 F.3d at 711, we suggested that the decision to

a. Design and sign placement

The Sign Manual sets forth guidelines on the use of signs along park roads:

> The decision to utilize a particular sign at a particular location requires the professional judgment of the park manager — drawing upon available guides, resources, and traffic safety engineering expertise — and considering a variety of other factors, such as the appearance of the road as a whole and its relationship to the natural and/or historical environment through which it passes.
>
> It is important in this regard, too, that such decisions bear in mind long standing [National Park Service] policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure for the safety of park visitors.

Far from imposing mandatory requirements, the Sign Manual states that decisions about the use and placement of signs are made at the discretion of the park manager, who must weigh competing ends — minimal intrusion, avoidance of unnecessary proliferation of signs and the safety of visitors.

[10] The Park Service's decisions about designing the Road with warning signs placed at particular points are not mandated one way or another by the Sign Manual. The Service must balance a panoply of social, economic and political considerations applicable to the distinctive nature of park roads

adopt a 45 m.p.h. speed limit on a snowmobile trail would be protected under the discretionary function exception. This statement was not essential to the holding in *Oberson*, as the government itself noted during oral argument before us, and it was not developed or otherwise explained.

when determining whether to design a road with a given sign at a particular location. Deciding whether to warn of the potential danger of stopped traffic at the site of the accident is therefore a judgment "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). The district court did not err in granting summary judgment to the government on the Soldanos' claim that the government negligently designed the Road with insufficient warning signs. *See Blackburn*, 100 F.3d at 1431; *Childers*, 40 F.3d at 976.

b.   Design and speed limit

**[11]** Setting a safe speed limit for the Road as designed, however, is different, because doing so is essentially a matter of scientific and professional judgment, and "matters of scientific and professional judgment — particularly judgments concerning safety — are rarely considered to be susceptible to social, economic, or political policy." *Whisnant*, 400 F.3d at 1183.

**[12]** The 1984 Standards specify appropriate speed limits in light of such empirical factors as the elevation and stopping-sight distance of a road. Significantly, they allow a speed limit of 35 m.p.h. only where the minimum, actual stopping-sight distance meets or exceeds 225 feet.[4] Here, the Soldanos' expert opined, without contradiction, that the actual stopping-

---

[4]In the Standards' words:

> Minimum stopping sight distance . . . [is] directly related to the design speed of the road. . . . The minimum and desirable stopping sight distances for roads at various design speeds are shown in Table 6. Minimum distances assume that the vehicle is traveling at less than the design speed, while the desirable distances assume that the vehicle is traveling at the design speed.

Table 6 specifies the minimum stopping-sight distance of a road with a 35 m.p.h. speed limit as 225 feet. It further states that the desirable stopping-sight distance for such a road is 250 feet.

sight distance of the Road is no greater than 180 feet at the location of the accident due to the upward "sideslope" of the Road as it curves around the granite mountain. Plainly, the Road's 35 m.p.h. speed limit at the accident location is at odds with the specifications in Table 6 of the Standards, which require a speed limit of no more than 25 m.p.h. for roads with the characteristics of the accident site.

**[13]** "[W]e have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." *Whisnant*, 400 F.3d at 1181 (original emphasis). The element of choice involved in the Park Service's decision not to implement a speed limit on the Road consistent with the Standards' safety guidelines "resembles more a departure from the safety considerations established in Service policies, akin to the situations we confronted in *Seyler*, *ARA*, and with regard to the construction of the canal in *Kennewick*,[5] than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors . . . ." *Summers*, 905 F.2d at 1216. Nor does the element of choice entail a protected, discretionary selection of the means used to meet a general policy goal, such as was the case in *Blackburn*, 100 F.3d at 1431, and *Valdez*, 56 F.3d at 1180.

The government acknowledges that the Road's speed limit is not consistent with the Standards, but contends that the Standards are not applicable to the Road and thus that the Road's speed limit is not a departure from the Standards' safety specifications. In particular, the government relies on the Standards' purported limitation to the "new construction

---

[5]In *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1031-32 (9th Cir. 1989), we held that the discretionary function exception shielded the government from liability arising from the consequences of its design of a canal, but did not protect the government from its negligent construction of the canal.

and reconstruction of park roads" and, in the context of recon-
struction, the qualification that they apply only "to the extent
practicable and feasible." The government also draws our
attention to the Standards' acknowledgment that they "will in
some instances not be attainable" on rehabilitation, restoration
and resurfacing projects. Because the Road predates the Stan-
dards' inception, is not a new construction and has not been
reconstructed, the government says the Standards do not
apply. We find this argument unconvincing, both because it
seems to suggest that the Standards are entirely irrelevant to
a major access road in a major national park and because it
implies that the Standards' objective safety specifications
have no bearing on the safe maintenance of pre-existing
roads. Moreover, this argument is inconsistent with Superin-
tendent Tollefson's own declaration that the Standards
embody the Park Service's "long standing policies . . . with
respect to the design and construction of roads in national
parks."

As a fallback, the government urges that even if the Stan-
dards are applicable, they endow the Park Service with a
degree of design flexibility that militates against finding any
of the Standards' safety specifications to be mandatory.
According to the Standards' preface:

> The standards contained herein provide flexibility in
> the planning and design processes to allow for con-
> sideration of variations in types and intensities of
> park use, for wide differences in terrain and climatic
> conditions, and for protection of natural and cultural
> resources in National Park System areas.

> It is important to note that the standards vary consid-
> erably with the type of use to be accommodated.
> Basic decisions will have to be made by park man-
> agement in the application of these standards based
> on careful examinations of the desired use levels to
> be allowed considering impacts on visitor use and

> resource protection in conformance with legislative mandates.

> The criteria presented have been adapted from available design standards to meet the unique requirements of park roads. This will provide a framework within which design and construction of park roads should be conducted; however, this document is not intended to encompass a level of detail comparable to that normally found in design manuals.

We recognize that the Standards also vest park managers with some discretion in designing park roads to conform with the special purpose of such roads, which "are not intended to provide fast and convenient transportation," but instead "to enhance visitor experience while providing safe and efficient accommodation of park visitors and to serve essential management access needs."[6]

[14] Even granting that the government is correct that the Standards are inapplicable to the Road's *design*, it does not follow that the Standards' basic, scientific safety specifications may be disregarded, particularly those that do not require redesigning or reconstructing the Road. As the Standards state, "[w]hile park roads are designed differently from other roads, they are designed, constructed, and *maintained*

---

[6]The Soldanos argue that all this is immaterial because, according to their expert, the Park Service's Standards adopted the specifications that had been developed in the 1930s by the American Association of State Highway and Transportation Officials ("AASHTO") for stopping-sight distance, radius and degree of curves and design speed. The Soldanos thus urge that the Standards' latter-day requirements were already in existence and applicable to the Road when it was originally designed and made. The Soldanos, however, have introduced no admissible evidence that the Park Service adopted and made the AASHTO standards mandatory, and the Standards themselves state that criteria drawn from "available design standards" such as AASHTO have been "*adapted* . . . to meet the *unique* requirements of park roads." (Emphasis added.)

within the norms of sound geometric standards for safety and structural sufficiency." (Emphasis added.) *Cf. ARA Leisure Servs.*, 831 F.2d at 195 ("Park Service standards explicitly required that park roads 'conform to the original grades and alignments' and that graded roads be 'firm, [and] of uniform cross section.' "). And whatever flexibility the Standards grant the Park Service in designing a road, they do specify that park roads "provid[e] *safe* and efficient accommodation of park visitors." (Emphasis added.) There is no reason to suppose that this safety requirement and the Standards' safety specifications do not apply to the current operation of park roads that the Park Service itself acknowledges receive heavy use during tourist seasons, simply because they are old.

   **[15]** Thus, although we agree with the district court that the discretionary function exception shields the government from liability arising from challenges to its overall design of the Road and the means by which the Service effected that design — including such placement and configuration choices as the creation of the Cascade Creek Bridge vista point at the site of the accident — we hold that the government is not insulated from the claim that it negligently set an unsafe speed limit for this part of the Road, relative to its design. As in *ARA Leisure*, where the Park Service's decision to design the Denali Park Road without guard rails was protected, but its failure to maintain the road in a state of safe repair was not, so here the Park Service's decision to design the Road "to closely follow[ ] . . . granite mountains" and to have a vista point in a given location is protected, but its failure to set a speed limit consistent with those design choices is not.[7] *See ARA Leisure Servs.*, 831 F.2d at 195; *see also Oberson*, 441 F.3d at 710-11;

---

[7]With the exception of Superintendent Tollefson's conclusory assertion that the "establishment of speed limits" is not governed by "mandatory statutes, regulations or policies" but by noncompulsory policies, the government has introduced no evidence demonstrating that the Park Service's decision to set a 35 m.p.h. speed limit was the result of a decision grounded in social, economic and political policy as opposed to professional and scientific judgment. During oral argument, the government con-

*Summers*, 905 F.2d at 1216; *Seyler*, 832 F.2d at 123. Accordingly, the government's purported failure to set a safe speed limit on the Road remains a triable issue that is not precluded by the discretionary function exception.

[16] Because the district court erred in finding that the discretionary function exception bars the Soldanos' claim that the government negligently set the speed limit for the Road, we reverse the court's summary judgment to that extent and remand for further proceedings. In all other respects, we affirm the district court's judgment.

**AFFIRMED** in part, **REVERSED** in part. The parties shall bear their own costs on appeal.

---

tended that it had no obligation to adduce such evidence, but could instead rely on hypothetical justifications indicative of a social, economic and political judgment. The law is to the contrary. *See, e.g.*, *Oberson*, 441 F.3d at 712 (failure to warn of hazardous conditions on a snowmobile trail at a particular speed is not protected where there is an absence of evidence that the failure to post a warning was actually the product of a policy choice); *Seyler*, 832 F.2d at 123 (noting that nothing in the record demonstrated that the failure to post speed limits on an Indian reservation road actually resulted from a policy decision).