**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICARDO ANGEL NAVARETTE,
     *Plaintiff-Appellant,*

    and

KELLY KASLAR,

     *Plaintiff,*

    v.

UNITED STATES OF AMERICA,
     *Defendant-Appellee.*

No. 05-16915

D.C. No.
CV-04-00760-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
July 13, 2007—San Francisco, California

Filed August 29, 2007

Before: Procter Hug, Jr., Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Rymer

**COUNSEL**

Amitai Schwartz (argued), Lisa M. Sitkin, Law Offices of Amitai Schwartz, Emeryville, California, for the plaintiff-appellant.

Kevin V. Ryan, United States Attorney, Joann M. Swanson, Chief, Civil Division, Owen P. Martikan (argued), Assistant United States Attorney, San Francisco, California, for the defendant-appellee.

---

**OPINION**

FISHER, Circuit Judge:

Ricardo Navarette was severely injured when he fell off a cliff at a campground operated by the Army Corps of Engineers (Army Corps) near Lake Sonoma in northern California. Alleging that the campground staff had been negligent in failing to undertake safety precautions after a "use path" had developed that led directly from his campsite to the cliff's edge, Navarette sued the government for damages under the Federal Tort Claims Act (FTCA). The district court granted summary judgment for the government, finding that the discretionary function exception barred jurisdiction under the FTCA. We hold that the discretionary function exception does not apply and reverse.

*I. Background*

Navarette was injured in April 1997 at the Liberty Glen Campground, which the Army Corps owns and operates. On the night of his accident, Navarette was camping with his brother and a group of friends at a site numbered "C-88." Navarette and a friend, Kelly Kaslar, walked down an unmarked path from site C-88 in the direction of flashlights

visible at another campsite. The path led directly to the edge of a cliff. Navarette and Kaslar fell off the cliff and fell approximately 30 feet to the rocks below. Navarette suffered a brain injury that, according to physicians' reports, will permanently affect his functioning.

The path leading to the cliff was not part of the campground plan, but rather a "use path" that had been worn down by animals and campers. By 1995 at the latest, well before Navarette's accident, rangers at Liberty Glen had noticed the path leading from C-88 to the cliff, but the Army Corps had done nothing to alert campers using the path to the dangerous drop off. Indeed, during their regular safety meetings campground administrators and staff never discussed whether to take safety precautions related to the path. Following the accident, however, the staff met to discuss the incident. Their reaction, as one ranger put it, was "Oh my God! We can absolutely see how it happened."

In 2004, Navarette filed a complaint seeking damages from the United States under the FTCA, 28 U.S.C. § 1346(b)(1). The district court granted the government's summary judgment motion, finding that Navarette's suit was barred by the discretionary function exception. Navarette then filed this appeal.

## II. Discretionary Function Exception

We review the district court's summary judgment de novo. *See Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006). "We must determine, viewing the evidence in the light most favorable to . . . the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.* (internal quotation marks omitted) (omission in original).

[1] The FTCA waives the government's sovereign immunity for civil actions on claims for money damages, including

claims for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b)(1). Federal courts' jurisdiction over such claims is limited by an exception for:

> [a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

[2] The Supreme Court has created a two-pronged test for applying this "discretionary function exception." First, we must consider "whether the action is a matter of choice for the acting employee." *Berkovitz v. United States*, 486 U.S. 531, 536 (1987). The exception does not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the government employee deviates from this course. *Id.* Second, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Because "[t]he basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy," the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 536-37 (internal quotation marks omitted). "It is the government's burden to demonstrate the applicability of the discretionary function exception." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).

Navarette argues that the Army Corps' failure to warn campers of the danger posed by the use path leading to the cliff's edge was not a discretionary choice, because the government had already adopted policies requiring that the campground be maintained in a safe manner and that such dangerous terrain conditions be marked or fenced. He cites 36 C.F.R § 327.1 (1997), which requires the Army Corps to manage the resources entrusted to it so as to "provid[e] the public with safe and healthful recreational opportunities while protecting and enhancing these resources," and the Army Corps' Engineering Manual 1110-1-400, which lists as a "Guiding Principle" "maintaining health, safety, security and comfort of the customers in all aspects."[1] These statements, however, are simply general admonitions to make the campsite safe; they are not specific enough to make governmental decisions regarding the path and cliff at issue here nondiscretionary. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989) (holding that a "general statutory duty to promote safety" is insufficient to show that the government lacked discretion).

[3] However, Navarette's argument finds more traction in the Army Corps' "Lake Sonoma Safety Plan." The Safety Plan's checklist includes an instruction that "*[d]angerous terrain conditions, such as drop-offs, etc, will be properly marked or fenced.*" (Emphasis added.) The government argues that compliance with this instruction was discretionary because the Safety Plan's preface states: "The program and checklist contained herein are not considered complete or

---

[1]The Engineering Manual in effect at the time of Navarette's accident was dated July 1987; the Army Corps issued a new, superseding edition in November 2004. The district court and government apparently assume that the 2004 edition controls here. It is unclear why the 2004 Manual would govern since Navarette's accident occurred in 1997, or how the 2004 version might differ from the 1987 version; but on appeal, Navarette does not contest the applicability of the later Manual. Also, with regard to the cited portion of 36 C.F.R. § 327.1, we note it has not changed since Navarette's accident.

entire since programs will be added, deleted, or modified as the need presents itself, and the checklist is presented only as a guide in the accomplishment of responsibilities." According to the government's argument, if the checklist was merely "a guide in the accomplishment of responsibilities," then park employees had discretion as to whether or not to follow the checklist's instructions. However, in light of the preface's explanation that "[t]he program and checklist contained herein are not considered complete or entire," the "only as a guide" language suggests that employees were not to view the checklist as encompassing the entirety of their duties. That the listed requirements may not have been comprehensive does not mean that they were not mandatory.

Moreover, prefatory language introducing flexibility into the government's duties does not trump the government's imposition of specific duties on itself. The preface here is similar to that in the Park Service standards we addressed in *Soldano*:

> The standards contained herein provide flexibility in the planning and design processes . . . . It is important to note that the standards vary considerably with the type of use to be accommodated. Basic decisions will have to be made by park management in the application of these standards based on careful examinations of the desired use levels to be allowed considering impacts on visitor use and resource protection in conformance with legislative mandates. The criteria presented have been adapted from available design standards to meet the unique requirements of park roads. This will provide a framework within which design and construction of park roads should be conducted; however, this document is not intended to encompass a level of detail comparable to that normally found in design manuals.

453 F.3d at 1149. Despite this language, we concluded that the "Park Service's decision to design the Road to closely fol-

low granite mountains and to have a vista point in a given location is protected, but its failure to set a speed limit consistent with those design choices [and the Park Service's own specified standards correlating minimum stopping distances with maximum safe speed limits] is not." *Id.* at 1150-51 (internal quotation marks and alterations omitted). The flexibility that the Park Service's standards included did not undermine its duties where it had already decided upon a sufficiently specific standard. *See id.* at 1150 (stating that regardless of whether the standards permitted the Park Service discretion in road design choices, "it does not follow that the Standards' basic, scientific safety specifications may be disregarded, particularly those that do not require redesigning or reconstructing the Road").

For similar reasons, we also reject the government's argument that the Army Corps' more general guidelines relating to signs and fences in Engineering Manual 1110-1-400 make the Safety Plan's more specific requirements discretionary. First, the Manual generally provides that fencing and signs be limited to those places where necessary.[2] But the Safety Plan expressly places drop-offs and other dangerous terrain in that "necessary" category. Second, the Army Corps certainly

---

[2]Section 2.13.2 of the Manual states:

> Fencing should generally only be constructed for access control, traffic control, screening, and safety purposes. Care must be exercised in determining the type and location of fencing. Where fencing is necessary it should be of the minimum height and design possible to be unobtrusive and still accomplish the required function.

Section 2.14 provides that:

> Signs shall be provided only where needed to regulate traffic, warn of hazardous conditions, establish restrictions, and provide information. The number of signs should be kept at a minimum. Symbol signs shall be used whenever feasible. Detailed guidance on all traffic, warning and information signs and their placement shall conform to EP 310-1-6a and 6b, the Corps' "Sign Standards Manual."

retained discretion as to *how* to mark or fence drop-offs, but that does not mean it retained discretion *whether* to do so. *See Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994) (stating that "*the precise manner* in which NPS would warn the public" as required by the National Park Service safety manual "clearly [fell] within the discretionary function exception") (emphasis in original); *see also Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) (addressing the government's discretion to "determin[e] the precise manner in which to warn" of hazards). When Navarette fell over the cliff, however, the government had not warned campers about the drop-off in *any* way.

**[4]** The government nonetheless argues that the Safety Plan left intact its discretion to determine whether the terrain at issue here was in fact dangerous.[3] We disagree. The Safety Plan's instruction that "[d]angerous terrain conditions, such as drop-offs, etc, will be properly marked or fenced" is sufficiently "specific and mandatory" to create "clear duties incumbent upon the governmental actors." *Kennewick Irrigation Dist.*, 880 F.2d at 1026. Although the Corps may have had discretion to decide what constituted a drop-off, or to identify other types of "dangerous terrain," there is no dispute here that the 30-foot drop from the path to the rocks below was in fact a drop-off. As such, *it had to be* "properly marked or fenced" according the plain terms of the Safety Plan.

Given the Safety Plan's specificity, cases involving government directives to provide warning of "special hazards" are inapposite. *Cf. Valdez v. United States*, 56 F.3d 1177, 1179 n.2 (9th Cir. 1995) (addressing a national park policy stating that "[b]rochures specific to the area should contain safety messages that direct attention to special hazards or attractions

---

[3]The government wisely does not argue that the fact that this path was not part of the campsite's original design negates its duty to follow the directives of the Safety Plan, which applies to the "[a]ccess area grounds" within the Lake Sonoma "facilities," not only to campground designs.

that could be potentially hazardous to the visitor"); *Black-burn*, 100 F.3d at 1431 ("[T]he policy manual's broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards . . . [and] in determining which hazards require an explicit warning."). Where an adopted policy speaks in such general terms, we have concluded that it is simply a "broad mandate to warn the public of 'special hazards' " that "necessarily encompasses an element of discretion in identifying such hazards." *Valdez*, 56 F.3d at 1180; *see also Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001) (addressing cases in which "broad mandates did not specify a course of conduct for the government to follow"). However, we have refused to read governmental discretion into policies sufficiently determinate to identify a particular course of proper government action, because "[w]here the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away." *ARA Leisure Services v. United States*, 831 F.2d 193, 195 (9th Cir. 1987); *see also Soldano*, 453 F.3d at 1148 (stating that there was no governmental discretion involved in the application of standards correlating a road's maximum safe speed limit with the road's minimum stopping sight distance); *Berkovitz*, 486 U.S. at 540-43 (holding that the government lacked discretion to issue a license to produce a vaccine without requiring the manufacturer to submit certain test data as required by regulation).

**[5]** Here, the Army Corps had already decided that drop-offs were — in *Valdez*'s terminology — a "special hazard," or — in the Safety Plan's words — "a dangerous terrain condition."[4] Accordingly, we hold that the Army Corps' duty to

---

[4]Even if we agreed with the dissent that the Safety Plan gave the Army Corps some discretion to determine which drop-offs were dangerous, the path's termination at a cliff's edge was clearly dangerous at nighttime and may well have constituted dangerous terrain as a matter of law. *Cf. Termini v. United States*, 963 F.2d 1264, 1269 (9th Cir. 1992) (stating that "[a] cliff at the end of a dirt road that is not visible from the beginning of the road would certainly seem to qualify for a warning sign under . . . guidelines" directing the government to warn of hazardous conditions).

mark or fence the path leading to the cliff was "specific and mandatory," and thus did not come within the discretionary exception. *Kennewick Irrigation Dist.*, 880 F.2d at 1026.

Accordingly, we REVERSE and REMAND for further proceedings.

**REVERSED and REMANDED.**

RYMER, Circuit Judge, dissenting:

I read the Safety Plan's "dangerous terrain" provision differently from the majority, and therefore dissent. The Plan's "Guideline's Relative to Visitor Safety" states with respect to "Access area grounds" that "Dangerous terrain conditions, such as drop-offs, etc, will be properly marked or fenced." As I read it, this part of the Plan's checklist, which the Plan notes is only a guide, refers to drop-offs as an example of the kind of terrain condition that may be dangerous, not as a declaration that all drop-offs are dangerous. So construed, applying the Guideline involves a judgment as to whether a particular drop-off (or other condition of like nature) is actually dangerous.

I also disagree that this case is similar to *Soldano v. United States*, 453 F.3d 1140 (9th Cir. 2006). There the plaintiff claimed, among other things, that the Park Service negligently set the speed limit for the road on which he had an accident. *Id.* at 1143. The standards were quite specific: they allowed a speed limit of 35 m.p.h. only where the minimum, actual stopping-sight distance meets or exceeds 225 feet. *Id.* at 1148. Given uncontradicted evidence that the stopping-sight distance was less than that, we held that the decision to set a speed limit at 35 m.p.h. was "circumscribed by objective safety criteria and was not the result of a policy decision of the kind protected by the discretionary function exception."

*Id.* at 1147; *see also, e.g., ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (holding that the Park Service's decision to design the Denali Park Road without guardrails was grounded in policy, but the failure to maintain a pass on that road to "conform to the original grades and alignments" and to be "firm, [and] of uniform cross section" as required by Park Service standards was not).

As a safety standard operates to remove discretion under the first prong of the discretionary function test when the standard "is embodied in a *specific* and *mandatory* regulation or statute which creates clear duties incumbent upon the governmental actors," *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989), I would hold as the district court did, that discretion was not erased by the Safety Plan or any language in the Engineering Manual.